IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DAVID ROBERTS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:15-CV-1217-L** |
| | § | |
| **OVERBY-SEAWELL COMPANY,** | § | |
| **BRECKENRIDGE INSURANCE GROUP,** | § | |
| **INC., and BRECKENRIDGE IS, INC.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: Defendants' Motion for Partial Summary Judgment (Doc. 74), filed June 16, 2017; Plaintiff's Motion for Summary Judgment (Doc. 80), filed June 16, 2017; Defendants' Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71), filed June 16, 2017; Plaintiff's Motion to Exclude Expert (Doc. 76), filed June 16, 2017; and Defendants' Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104), filed July 21, 2017. Having considered the motions, legal briefing, appendixes, evidence, record, and applicable law, the court **grants in part** and **denies in part** Defendants' Motion for Partial Summary Judgment (Doc. 74); **grants in part** and **denies in part** Plaintiff's Motion for Summary Judgment (Doc. 80); **denies** Defendants' Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71); **grants** Plaintiff's Motion to Exclude Expert (Doc. 76); and **denies** Defendants' Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104).

## I.      Background Facts and Procedural History

This action arises from a dispute between an insurance salesman, Plaintiff David Roberts ("Roberts"), and his former employer, Defendant Overby-Seawell Company ("OSC"), a subsidiary of Defendant Breckenridge IS, Inc. ("Breckenridge IS"). Roberts contends that OSC failed to pay him contingent commissions to which he was entitled under the parties' agreement, and reduced his commission checks by $35,000 per month over a period of ten months without his authorization. Defendants contend that Roberts was not owed contingent commissions, and that contingent commissions cannot even be calculated for an individual salesperson. Alternatively, Defendants contend that Roberts waived any right to seek contingent commissions by failing to assert his entitlement to them during his employment at OSC. With regard to the $35,000 deducted each month from Roberts's commission check, Defendants assert that Roberts agreed to this deduction.

On March 24, 2015, Roberts filed Plaintiff's Original Petition in the 160th Judicial District Court, Dallas County, Texas, against OSC, as well as Breckenridge Insurance Group, Inc. ("Breckenridge Group"), which acquired OSC in 2010. On April 22, 2015, Defendants OSC and Breckenridge Group removed this action to the district court for the Northern District of Texas on grounds that complete diversity of citizenship exists between the parties and that the amount in controversy exceeds $75,000, exclusive of interest and costs.

On May 12, 2015, Roberts amended his pleadings, and on September 23, 2015, after the court granted him leave, he filed Plaintiff's Second Amended Complaint ("Complaint") (Doc. 19), the operative pleading in this case, adding Breckenridge IS as a party. Roberts is suing Defendants for: (1) breach of contract; (2) promissory estoppel; and (3) quantum meruit, and he also seeks declaratory relief with respect to the rights and obligations of the parties. Roberts seeks actual

damages, attorney's fees, and costs. Disagreeing about the specifics of Roberts's commission agreement and contending that Roberts breached a confidentiality agreement, Defendants OSC and Breckenridge IS (sometimes collectively "Defendants") offer a number of affirmative defenses and assert counterclaims against Roberts for: (1) breach of fiduciary duty; (2) fraud by nondisclosure; (3) misappropriation of trade secrets; and (4) breach of contract. *See* Defs.' Ans. to Pl.'s Sec. Am. Compl. and Overby-Seawall Company and Breckenridge IS's Counterclaims against Pl. (Doc. 20).[1] Defendants seek actual damages, exemplary damages, costs, and attorney's fees. The court now sets forth the facts in accordance with the standard in Section II(A) of this opinion.[2]

### A. OSC's Business

OSC is a Managing General Agency (MGA) in the business of selling lender or "force placed" insurance to its clients (including banks and mortgage servicing companies) and placing those policies with various insurance companies. "Force placed" insurance coverage is insurance placed on collateral by a lender seeking to protect its interests when the borrower fails to maintain the required insurance coverage on the collateral. In 2010, Breckenridge Group acquired OSC. Breckenridge IS is the "parent company" with whom OSC and Breckenridge Group are affiliated.

---

[1] In their Answer, Defendants assert that "Breckenridge Insurance Group, Inc. did not employ Plaintiff at any time. Breckenridge IS, Inc., a Delaware corporation with its principal place of business in Georgia, is the parent company of both OSC and Breckenridge Insurance Group, Inc." *See* Defs.' Ans. to Pl.'s Sec. Am. Compl. and Overby-Seawall Company and Breckenridge IS's Counterclaims against Pl. 1 n.1 (Doc. 20).

[2] The court's recitation of the facts is taken from the uncontested evidence contained in the summary judgment record provided by the parties, or evidence to which the court has overruled a party's objection. Contested facts are noted. The court only cites to the record when it is directly quoting from it.

### B.    OSC's Commission Structure

As part of the revenue received from certain carriers with whom OSC places business, OSC may be entitled to contingent commissions from insurance carriers. Contingent commissions, also known as profit commissions, are based on the overall profitability of the accounts that OSC places with each insurance carrier. The insurance carrier evaluates the overall profitability of the book of business that OSC placed with it and performs this analysis based on a three-year period. Even if a contingent commission is paid to OSC in one year, it is possible that if the contingents are negative for the following year that OSC could be required to repay money to the carrier or that the negative amounts are carried forward year after year.

Mark Pearce, Head of the Underwriting Department for OSC, explained the commission structure as follows:

Q. What are contingent commissions?

A. Contingent commission in our world is -- well, there's two pieces of the commission process. You get what they call front commission, which is commission that an agent or an agency earns as premium comes in the door. When policies -- when policies are paid for, contingent commission then is an additional piece of premium that an agency can earn if the portfolio of business that you write performs well below certain pre-established loss limits and -- and that's -- it's just an additional deal that you look after the fact. You say, okay, here's -- here's a year's worth of business. How did we do? We took in this much premium, we had this many losses. And based on the calculation then as described by each carrier that you have a relationship with -- and there is a calculation that occurs after on a retrospective basis.

Q. And if the company wanted to, they could drill down and figure out how much of that was related to each individual salesperson's production?

A. Oh, yeah, I would think so. Yeah. We certainly keep track of -- we certainly keep track of premium and losses at a client level, policy level.

Pl.'s Summ. J. App. 218-219 (Doc. 82). Eugene Norton ("Norton"), OSC's Vice-President of Accounting, who was designated by Defendants as the corporate representative to speak on the structure and calculation of contingent payments, described a contingent commission as something that is "calculated contingent on the profitability of a business, of a book of business that's paid to the – someone like us[,] [a] general agent from the carrier" *Id.* at 176. Norton also stated at his deposition that contingent commissions are revenue:

> Q. So there's -- there may be more than this, but there's at least a couple of different revenue sources to OSC for writing business, that would be the front-end commission?
>
> A. Yes.
>
> Q. And then the contingent commission?
>
> A. Yes.

*Id.* at 176. Keith Gilroy ("Gilroy"), OSC's President, similarly stated at his deposition that contingent commissions are "an additional type of revenue." *Id.* at 81.

### C. Roberts's Employment with OSC

Roberts has worked in the insurance industry for twenty years. His primary focus is on "force placed" insurance and large accounts in the mortgage servicing space. On May 3, 2011, OSC hired Roberts as a sales executive. The offer letter states that Roberts's salary "will be $3,653.85 per bi-weekly pay period, plus commission, paid bi-weekly." Defs.' Summ. J. Resp. App. 1.

At the inception of his employment, Roberts signed a Confidentiality Agreement that stated in part:

> Best Efforts: Individual agrees to devote his full time and best efforts in his position relating to the marketing, selling, administrating, managing or servicing the Company's business and in the performance of any general duties as may be from time to time required by Company.

Conflict of Interest: Individual agrees that, during his employment with Company, he will not perform any activities or services or accept such other employment that would be inconsistent with Company's business or would in any way interfere with or present a conflict of interest concerning Individual's employment with Company.

Extent of Service: Individual shall exclusively devote his entire working time, energy and attention to his duties in connection with the Company.

*Id.* at 2 (Confidentiality Agreement).

Roberts brought in approximately $1,000,000 in premiums his first year. In January of 2012, Roberts signed OSC's largest account—Shellpoint Loan Servicing ("Shellpoint"), formerly named Resurgent. Shellpoint accounted for $9,000,000 in premiums in 2012 and grew to an annual premium exceeding $20,000,000.

**D.    The 2011 Commission Agreement**

In 2011, OSC's commission agreement provided that Roberts would receive 20% commission on "OSC Net Revenue" for the first year of a new account. Pl.'s Summ. J. App. 11 (2011 Commission Agreement) (Doc. 82). After one year, the commission changed to the renewal rate, which was 10% of "OSC Net Revenue." *Id.* The 2011 Commission Agreement did not define the terms "commission" or "OSC Net Revenue."

In February 2013, the Shellpoint account was in its thirteenth month. Under the 2011 Commission Agreement, therefore, Roberts's commission on that account lowered from 20% to the renewal rate of 10%. In the fall of 2013, Roberts noticed the reduction in his commission and questioned John Dangoia ("Dangoia"), then-president of OSC, and James Robertson ("Robertson), OSC's Executive Vice President, regarding the lower rate. Dangoia and Robertson reminded him that the 2011 Commission Agreement provided that after one year, commissions are paid on the

renewal rate.  Roberts thereafter agreed that his commissions had been paid properly under the 2011 Commission Agreement, even though he never received any portion of contingent commissions under that agreement.

### E.     The 2014 Commission Agreement

In the spring of 2014, after soliciting input from Roberts and other salespersons, OSC implemented a new commission agreement (the "2014 Commission Agreement"), retroactive to April 1, 2014.  *Id.* at 12 (2014 Commission Agreement).  The 2014 Commission Agreement removed the renewal rate, allowing the initial commission rate to be effective throughout the term of the agreement.   Commissions would now be paid on 12.5% of "OSC Gross Revenue."  *Id.*  Just as the 2011 Agreement did not define "OSC Net Revenue," the 2014 Commission Agreement did not define "commission" or "OSC Gross Revenue."  *Id.*

### F.     The $35,000 Monthly Deductions

Beginning in May 2014, the Shellpoint business no longer included a subagent commission. As a result, under OSC's commission structure, Roberts's commission percentage was to increase from 5% to 12.5%.  Contending that the elimination of a subagent translated into increased expenses associated with servicing the account, OSC began internal discussions about how to share these costs with Roberts.   On October 21, 2014, Robertson, Dangoia, and other OSC executives had a conference call with Roberts to propose a cost-sharing agreement.  The parties dispute whether Roberts ultimately agreed to share these costs.  While OSC believed, based on the conference call with Roberts, that he had agreed to share the costs associated with servicing the Shellpoint account, thereby authorizing the monthly deductions, Roberts stated at his deposition that he never agreed to share the expenses.  According to Roberts, he believed that no agreement was reached, as his

questions were never answered in a satisfactory manner and the information provided him was insufficient.

**G.     The Sales Bonus and General Release and Waiver of Claims**

In September 2014, OSC provided certain employees, including Roberts, a sales bonus in exchange for a release of claims. Defs.' Summ. J. Resp. App. 55-58 (Sales Bonus Agreement); *id.* at 59-61 (General Release and Waiver of Claims). The General Release provided that an employee receiving the sales bonus released Defendants from all claims in consideration for the sales bonus award. Roberts signed both documents.

OSC continued to pay commissions solely on revenue from premiums, and Roberts registered no complaints. During the entire period of his employment, Roberts never informed his employer that he expected to be paid on contingent commissions and never complained about not being paid them.

**H.     Termination of Roberts's Employment**

On March 20, 2015, Defendants terminated Roberts's employment. In the termination letter, Robertson stated that the basis for Roberts's termination included failing to use best efforts, engaging in unlawful competition, and usurping business opportunities. Defendants also threatened him in the letter with civil and criminal legal actions.

**I.     This Lawsuit**

On March 24, 2015, Roberts filed this civil action. This case was originally set for trial on the court's four-week docket commencing August 1, 2016. After numerous discovery disputes, which necessitated extensions of time and amendments to the court's scheduling order, on January 11, 2017, the court granted the parties' Amended Fifth Agreed Motion to Extend Scheduling Order

Deadlines. *See* Sixth Am. Sch. Order (Doc. 45). The court reset the trial date for the court's four-week docket beginning on October 2, 2017, extended the deadline for pretrial disclosures to September 5, 2017, extended the deadline to object to the opposing parties' pretrial disclosures to September 18, 2017, extended the deadline for dispositive motions to June 16, 2017, extended the deadline to challenge experts to June 16, 2017, and extended the deadline to complete all discovery, including expert discovery, to June 2, 2017. *See* Sixth Am. Sch. Ord. (Doc. 45).

On June 9, 2017, a week after discovery closed, Roberts filed a Motion to Compel Interrogatory Responses and Document Production. (Doc. 66). Among other things, Roberts argued that Defendants had "thwart[ed] [his] efforts to recover his commission on the contingent commission revenue received by Defendants" by arguing it was "not possible to calculate the amount of contingent commission allocable to an individual producer." Pl.'s Mot. to Compel 5. Robert introduced evidence that, contrary to Defendants' answers and objections to interrogatories and production requests, several of OSC's executives, including Norton and Pearce, stated in their depositions that contingent commissions could be calculated on the basis of an individual producer. Among other things, Roberts moved to compel a proper answer to Subpart (a) of Interrogatory 21 contained in Plaintiff's Fourth Set of Interrogatories to Overby Seawell and Breckenridge Insurance Group, Inc. and the Second Set to Breckenridge IS, Inc. The Interrogatory and Answer are as follows:

INTERROGATORY NO. 21: For all contingent commission payments received by you related to any business produced by Plaintiff, set forth:

(a) The amount of the contingent commission payment received which was attributable to business produced by Plaintiff;

ANSWER:

(a) Defendant is unable to break down all contingent commissions received by business produced by any salespeople, including Roberts. Defendant is also producing documents relating to contingent commissions received.

In support of his motion to compel, Roberts argued: "The documents produced with the response do not provide all of the information necessary to calculate Roberts' commission. Therefore, Roberts moves to compel a response that states the amount of contingent commission attributable to business produced by Roberts." Pl.'s Mot. to Compel 9-10. The court referred the motion to compel to United States Magistrate Judge Renée Harris Toliver. On July 18, 2017, Magistrate Judge Toliver held a hearing on Roberts's motion to compel. As the hearing was not officially transcribed, the court has listened to the audiotape of the hearing. At the hearing, after considering Roberts's argument that certain OSC executives had testified that contingent commissions could be calculated on the basis of an individual producer, Magistrate Judge Toliver granted Roberts's motion to compel with respect to Interrogatory No. 21, reopened discovery, and ordered Defendants to amend their responses to Interrogatory 21 by September 15, 2017. On September 11, 2017, she entered a written order memorializing her ruling. She also ruled that in lieu of amending their respective responses to Interrogatory No. 21, Defendants had the option of producing specified documents related to contingent commission payments. *See* Order on Pl.'s Mot. to Compel Interrogatory Resp. and Doc. Prod. (Doc. 118).[3]

---

[3] As part of her Order, Magistrate Judge Toliver also ordered Defendants to designate a Rule 30(b)(6) representative to be deposed on those topics upon which Robertson was originally designated by September 15, 2017, finding that Defendants did not provide sufficient notice to Roberts prior to withdrawing Robertson as a Rule 30(b)(6) deponent. Magistrate Judge Toliver denied the motion to compel insofar as certain of Roberts's requests for production, finding that these requests were not sufficiently specific to require a response.

On August 25, 2017, the parties filed an Agreed Motion to Extend Scheduling Order Deadlines ("Agreed Motion") (Doc. 114). While the parties did not seek an extension of the trial date, they sought extensions of the pretrial disclosure deadlines. In addition to notifying the court that the parties were attempting to settle the case and would be attending mediation, the parties informed the court of Magistrate Judge Toliver's decision and the need for additional time needed to fully comply with her ruling. According to the Agreed Motion:

> The Parties are currently working together to resolve the document production issues and in scheduling the additional deposition. Defendants are located in Georgia which is a complicating factor in finalizing additional discovery ordered by Magistrate Judge Toliver. The additional discovery is necessary to allow Plaintiff to fully comply with its pretrial disclosure obligations. Plaintiff also believes that the granting of Plaintiff's Motion to Compel materially bears on the resolution of all outstanding motions filed by Defendants. Due to ongoing settlement negotiations and the pending mediation, as well as completion of the discovery issues addressed by Magistrate Judge Toliver's ruling, the parties request that the Court extend the pretrial disclosure and objection deadlines so that the parties can focus their energy and resources on attempting to reach a resolution.

Agreed Mot. 3. On August 28, 2017, the court granted the Agreed Motion and, among other things, ordered the parties to conduct a settlement conference by September 15, 2017, extended the deadline for pretrial disclosures to September 19, 2017, and extended the deadline to object to the opposing parties' pretrial disclosures to September 25, 2017. *See* Order (Doc. 115). On September 14, 2017, the parties informed the court that they were unable to reach a settlement. On September 15, 2017, the court issued an order vacating all pretrial deadlines as well as the trial setting, stating it would reset the deadlines after ruling on the parties' pending motions. *See* Order (Doc. 12).

Prior to Magistrate Judge Toliver's ruling granting in part Roberts's motion to compel, the parties filed summary judgment motions that present overlapping facts, legal issues, and arguments. Roberts moves for summary judgment on his breach of contract claim as to the contingent

commissions and allegedly unauthorized monthly deductions from his commissions, as well as on

Defendants OSC and Breckenridge IS's counterclaims for breach of fiduciary duty, fraud by

nondisclosure, misappropriation of trade secrets, and breach of contract, and on their affirmative

defenses.  Defendants move for partial summary judgment on Roberts's breach of contract claim

against them relating to the contingent commissions (but not with respect to the allegedly

unauthorized monthly deductions), as well as on his promissory estoppel and quantum meruit claims

and his request for declaratory judgment.  Prior to Magistrate Judge Toliver's ruling granting in part

Roberts's motion to compel, the parties also filed motions to exclude experts, and Defendants filed

a motion to strike Roberts's expert declarations as untimely.  In light of Magistrate Judge Toliver's

ruling while these motions were pending, and as explained later in this decision, many of the issues

raised in the arguments in these motions are now moot. The court first addresses the parties'

respective summary judgment motions.

## II.     The Parties' Summary Judgment Motions

### A.      Applicable Legal Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas

Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine"

if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary

judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift*

*Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over

facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### B.    Analysis

#### 1.    Roberts's Motion for Partial Summary Judgment

Roberts seeks summary judgment on his breach of contract claim. In addition, he moves for summary judgment on all of Defendants' counterclaims and affirmative defenses.[4]

##### a.    *Breach of Contract Claim*

Roberts seeks summary judgment on his breach of contract claim. He contends that OSC breached the 2014 Commission Agreement by: (1) failing to pay him the contingent commissions to which he was entitled; and (2) by unilaterally reducing his commission checks by $35,000 per month over a period of ten months. The court considers these issues in turn.

###### i.    *Contingent Commissions*

Roberts argues that the 2014 Commission Agreement unambiguously provided that all salespersons would receive a percentage of "OSC Gross Revenue." *See* Pl.'s Summ. J. App. 12 (2014 Commission Agreement). Roberts contends that contingent commissions are part of gross

---

[4] Although Roberts labels his motion as "Plaintiff's Motion for Summary Judgment," as Defendants correctly point out, he has not moved for summary judgment on his claims for promissory estoppel or quantum meruit. Accordingly, his motion for summary judgment is actually a motion for partial summary judgment.

revenue and, pursuant to the plain language of the Commission Agreement, that he is entitled to be paid a percentage of contingent commissions. In support, Roberts relies on deposition testimony of OSC's executives Norton and Gilroy who stated contingent commissions are part of OSC's gross revenue paid to them by the carriers. Roberts contends that despite OSC's receipt of significant contingent commissions from the business sold by Roberts, Defendants have refused to pay him any commission at all for the contingent commission revenue received by Defendants from the carriers, even though his 2014 Commission Agreement clearly provides that he is entitled to a percentage of all revenue received by Defendants.

In response, Defendants argue that the 2014 Commission Agreement is ambiguous, and that the court should, therefore, deny Roberts's motion for summary judgment on this basis. As the parties' dispute concerns whether Roberts is entitled to contingent commissions under the 2014 Commission Agreement, the court's inquiry begins with the terms of the 2014 Commission Agreement and Texas law governing contract interpretation.

Under Texas law, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). "In construing a written contract, [the] primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). Thus, a contract must be interpreted as a whole "to give meaning to all of its terms," so that none is rendered meaningless, superfluous, or contradictory. *In re Isbell Records,*

*Inc.*, 586 F.3d 334, 337 (5th Cir. 2009); *accord Plains Exploration*, 473 S.W.3d at 305; *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014).

If a contract "is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe it as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 394 (citation omitted). "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (citation omitted). A contract is not ambiguous simply because the parties advance different interpretations. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "[I]f the contract [, however,] is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent." *Plains Exploration*, 473 S.W.3d at 305 (citation omitted). A "contract is not necessarily ambiguous merely because some sections arguably conflict." *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "[I]n Texas, a specific contractual provision prevails over a general provision." *Evercore Capital Partners II, L.L.C. v. Davis Trust (In re Davis Offshore, L.P.)*, 644 F.3d 259, 266 (5th Cir. 2011) (citation omitted); *see also Luig v. North Bay Enters., Inc.*, 55 F. Supp. 3d 942, 953 (N.D. Tex. 2014) (quoting *NuStar Energy*, 402 S.W.3d at 466) ("[T]o the extent of any conflict, specific provisions control over more general ones.").

Finally, a court should avoid when possible "a construction [that] is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987); *see also Pavecon, Inc. v. R-Com, Inc.*, 159 S.W.3d 219, 222 (Tex. App.—Fort Worth 2005, no pet.) (stating that when interpreting a contract, a court should avoid, if possible, "a construction that is unreasonable, inequitable, or oppressive, or would lead to an absurd result.").

Under Texas law, an ambiguity in a contract is either "patent" or "latent." *National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). A patent ambiguity in a contract is an ambiguity that is evident on the face of the contract. *Id.* (other citation omitted). A latent ambiguity, on the other hand, arises when a contract that is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. *Id.* (other citations omitted). In this matter, the court need look no farther than the face of 2014 Commission Agreement to determine whether a salesperson is entitled to contingent commissions is subject to more than one reasonable interpretation, and is, therefore, patently ambiguous.

The 2014 Commission Agreement is a one-page agreement and states that a salesperson's commissions are paid on a percentage of "OSC Gross Revenue." Pl.'s Summ. J. App. 12. Applying the rules of contract interpretation discussed previously, the court concludes the language is susceptible of two reasonable interpretations. Under the first interpretation, contingent commissions paid by the insurance carrier to the MGA, here OSC, are not included in the individual salesperson's compensation. Under this interpretation, "OSC gross revenue" is based on revenue generated by the operation of the OSC. This is the interpretation urged by Defendants. Under the second interpretation, "OSC Gross Revenue" is based on revenue generated from a particular salesman's

account, without any deductions. Looking at the contract as a whole in light of the circumstances present when the parties made the agreement, the court concludes that both interpretations are reasonable. Further, adopting either interpretation of whether contingent commissions paid by the insurance carriers to OSC are included in the calculation of a salesperson's commission payments requires the court to look beyond the four corners of the agreement and consider parol evidence to establish the true intention of the parties.

In sum, the court concludes that the 2014 Commission Agreement is patently ambiguous. To discern the true intent of the parties, parol evidence is required. Accordingly, the court will deny Roberts's motion for summary judgment on this claim.

*ii.*      *$35,000 Monthly Deductions from Shellpoint Commissions*

Roberts also seeks summary judgment on his breach of contract claim based on Defendants' deduction of $35,000 from his commission on the Shellpoint account each month for a period of ten months. In opposition, Defendants argue that summary judgment should be denied because "[s]everal genuine issues of material fact exist regarding Plaintiff's claim for breach of contract based on deductions." Defs.' Resp. to Pl.'s Mot. for Summ J. 29 (Doc. 89). Having carefully considered the summary judgment record, the court agrees that genuine disputes of material fact preclude entry of summary judgment in Roberts's favor on this claim.

Beginning in May 2014, the Shellpoint business no longer included a subagent commission. As a result, under OSC's commission structure, Roberts's commission percentage was to increase from 5% to 12.5%. Contending that the elimination of a subagent translated into increased expenses associated with servicing the account, OSC began internal discussions about how to share these costs with Roberts. On October 21, 2014, Robertson, Dangoia, and other OSC executives, had a

conference call with Roberts to propose a cost-sharing agreement. The parties dispute whether Roberts ultimately agreed to share these costs. While OSC believed, based on the conference call with Roberts, that he had agreed to share the costs associated with servicing the Shellpoint account, thereby authorizing the monthly deductions, Roberts stated at his deposition that he never agreed to share the expenses. According to Roberts, he believed that no agreement was reached, as his questions were never answered in a satisfactory manner and the information provided him was insufficient. In their appendix supporting their response brief, Defendants include e-mails from Roberts indicating that he agreed to, at a minimum, share in "extraordinary expenses." *See* Defs.' Summ. J. Resp. App. 88-90, 113-17.

Based on the summary judgment record, genuine disputes of material fact exist as to whether and under what circumstances Roberts agreed to share in costs associated with the Shellpoint account and whether the deductions from his Shellpoint commissions constitute "extraordinary expenses." For these reasons, the court will deny Roberts's motion for summary judgment on his breach of contract claim based on the deductions from his Shellpoint commissions.

### b.    *Defendants' Counterclaims*

The court now turns to Roberts's argument that he is entitled to summary judgment on all Defendants' counterclaims. As previously stated, Defendants assert counterclaims against Roberts for: (1) breach of fiduciary duty; (2) fraud by nondisclosure; (3) misappropriation of trade secrets; and (4) breach of a confidentiality agreement. *See* Defs.' Ans. to Pl.'s Sec. Am. Compl. and Overby-Seawall Company and Breckenridge IS's Counterclaims against Pl. (Doc. 20).

*i.      Breach of Fiduciary Duty*

Roberts seeks summary judgment on Defendants' counterclaim for breach of fiduciary duty. In support, he argues he does not owe Defendants a fiduciary duty and that Defendants have no evidence of damages arising from his alleged breach of fiduciary duties.  In opposition, Defendants contend that Roberts owed them a fiduciary duty and breached that duty by failing to disclose his ownership interest in other entities, and by focusing his time and effort on those entities to his own personal benefit instead of pursuing new business for OSC.[5]

Under Texas law, the elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary duty; and (3) the breach resulted in injury to the plaintiff or benefit to the defendant.  *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citation omitted).  Texas recognizes that the agent-principal relationship gives rise to a fiduciary duty. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d, 509, 513 (Tex. 1941); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 2017 WL 635031, at *11 (N.D. Tex. Feb. 16, 2017) (Fitzwater, J.) (noting Texas law recognizes the principal-agent relationship gives rise to a fiduciary duty).  An agent "has a duty to deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business." *Navigant Consulting*, 508 F.3d at 283-84 (citation omitted). Further, an agent who negotiates on behalf of his principal must disclose any adverse interest in the matter of the negotiation. *Id.* at 285; *see also Kinzbach*, 160

---

[5] Defendants inform the court that while at the time they filed their Answer they believed Roberts's entities competed with OSC, they learned during discovery that these entities did not directly compete with OSC.  Defendants still assert, though, that Roberts concealed the fact that he stood to gain financially from his interest in these other entities.

S.W.2d at 509; *Abetter Trucking*, 113 S.W.3d at 511. An agent owes a "duty to deal fairly with the principal in all transactions between them." *Abetter Trucking*, 113 S.W.3d at 510 (citations omitted).

First, the court concludes that Roberts, acting as an agent who negotiated on behalf of OSC, owed Defendants a fiduciary duty that arose as a matter of law as part of the principal agent relationship.[6] Second, contrary to Roberts's argument in his motion for summary judgment, Defendants do not need evidence of damages, as a benefit to the plaintiff suffices to prevail on a breach of fiduciary duty claim. *Navigant Consulting*, 508 F.3d at 283. Roberts's income tax returns are evidence of profits from these other businesses sufficient to raise a genuine dispute of material fact as to whether he benefited from the alleged breach. *See* Defs.' Summ. J. App. 178, 185-89, 193, 196-200, 206, 211-15.

Having reviewed the summary judgment record, the court determines that the parties have provided conflicting evidence as to whether Roberts fully disclosed his ownership interest and active role in other entities to Defendants, including Equiguard Agency, Lendwell, and Tech2Roi. Defs.' Summ. J. Resp. App. 21-22, 103-04, 128. As this issue is at the heart of Defendants' breach of fiduciary duty counterclaim, the court will deny Roberts's motion for summary judgment on this counterclaim.

---

[6] Even were the court to conclude that a formal fiduciary duty did not arise as a matter of law out of the principal-agent relationship in this case, the court would conclude that an informal fiduciary relationship arose out of the employer-employee relationship. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998) ("An informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.") (citation omitted).

*ii.      Breach of Confidentiality Agreement*

Roberts seeks summary judgment on Defendants' counterclaim for breach of the confidentiality agreement he signed when he began working at OSC. Among other things, Roberts argues that Defendants have no evidence of damages based on the alleged breach. The court agrees.

As previously stated, Roberts signed a Confidentiality Agreement that stated in part:

Best Efforts: Individual agrees to devote his full time and best efforts in his position relating to the marketing, selling, administrating, managing or servicing the Company's business and in the performance of any general duties as may be from time to time required by Company.

Conflict of Interest: Individual agrees that, during his employment with Company, he will not perform any activities or services or accept such other employment that would be inconsistent with Company's business or would in any way interfere with or present a conflict of interest concerning Individual's employment with Company.

Extent of Service: Individual shall exclusively devote his entire working time, energy and attention to his duties in connection with the Company.

Defs.' Summ. J. Resp. App. 2 (Confidentiality Agreement).

Under Texas law, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins*, 564 F.3d at 418 (quoting *Aguiar*, 167 S.W.3d at 450.

In response to Roberts's motion for summary judgment on Defendants' counterclaim for breach of the confidentiality agreement, Defendants' sole argument is as follows:

By devoting extensive time and effort to Equiguard Agency during working hours and spending "all his time" on the tenant liability program, which involved two of his entities, Plaintiff breached the "Best Efforts" and "Extent of Services" clauses. Plaintiff will argue that he disclosed his interests in Equiguard, Lendwell, and Tech2Roi to Defendants, but evidence in the record conflicts with this. App. 0000104, 000106, Ex. 42, Robertson Dep. 65:8-18; 154:3-12. Moreover, Plaintiff

> may also argue that he did not spend a significant amount of time on these entities during his working hours, but that raises a fact issue for the jury to determine. As such, summary judgment on Defendants' counterclaim for breach of contract should be denied.

Defs.' Summ. J. Resp. Br. 35-36 (Doc. 89). Defendants do not provide the court with any evidence of damages arising from Roberts's alleged breach of the confidentiality agreement. Further, it is not incumbent upon the court to scour the record for such evidence.

As Defendants have failed to raise a genuine dispute of material fact that they suffered any damages as a result of Roberts's alleged breach of the confidentiality agreement, the court will grant Roberts's motion for summary judgment on this counterclaim.

### iii. *Fraud by Nondisclosure and Misappropriation of Trade Secrets*

Roberts also moves for summary judgment on Defendants' counterclaims of fraud by nondisclosure and misappropriation of trade secrets. Defendants fail to address their counterclaims for fraud by nondisclosure and misappropriation of trade secrets, much less respond to any of Roberts's arguments in support of his motion for summary judgment on these two counterclaims. The court concludes that Defendants have abandoned or waived their fraud by nondisclosure and misappropriation of trade secrets counterclaims. When a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[]") (citation omitted). As Defendants failed to pursue their counterclaims for fraud by nondisclosure and misappropriation of trade secrets against Roberts, these counterclaims are no longer before the

court, and Defendants have abandoned or waived them. Accordingly, the court will grant summary judgment in Roberts's favor on these two counterclaims based on Defendants' waiver or abandonment.

### c.    *Defendants' Affirmative Defenses*

The court now addresses Roberts's argument that he is entitled to summary judgment on all Defendants' affirmative defenses. To reiterate, Defendants assert the following affirmative defenses: mistake, unclean hands, waiver, estoppel, duress, ratification, novation, accord and satisfaction, offset, and failure to mitigate.

With respect to the following affirmative defenses, Defendants fail to respond to Roberts's motion for summary judgment: offset, failure to mitigate, accord and satisfaction, novation, estoppel, duress, and ratification. As Defendants fail to address these affirmative defenses, much less respond to any of Robert's arguments in support of his motion for summary judgment on these affirmative defenses, the court concludes that Defendants have abandoned or waived these affirmative defenses. *See Black v. Panola Sch. Dist.*, 461 F.3d at 588; *Keenan v. Tejeda*, 290 F.3d at 262. As Defendants failed to pursue these affirmative defenses, they are no longer before the court, and Defendants have abandoned or waived them. Accordingly, the court will grant summary judgment in favor of Roberts on Defendants' affirmative defenses of offset, failure to mitigate, accord and satisfaction, novation, estoppel, duress, and ratification, and dismiss with prejudice these affirmative defenses.

With respect to the affirmative defenses of mistake, unclean hands, and waiver, however, the court has considered the summary judgment evidence and concludes that Defendants have raised genuine disputes of material fact as to each of these affirmative defenses, and Roberts is, therefore, not entitled to summary judgment on these affirmative defenses.

**B.  Defendants' Motion for Partial Summary Judgment**

Defendants move for summary judgment on Roberts's breach of contract claim related to the payment of contingent commissions, as well as on his promissory estoppel and quantum meruit claims, and his request for declaratory relief.

**1.  Roberts's Breach of Contract Claim - Contingent Commissions**

Defendants move for summary judgment on Roberts's breach of contract claim related to the payment of contingent commissions.[7]  In support, Defendants argue that they are entitled to summary judgment because "the undisputed evidence establishes that after two years of discovery, Plaintiff is still unable to quantify his alleged damages."  Defs.' Summ. J. Br. 18 (Doc. 75).  According to Defendants, "Plaintiff has not (and cannot) adduce evidence regarding how any carrier calculated contingent commissions paid to OSC.  Critically, Plaintiff has no evidence of whether, much less how and to what degree, his accounts contributed to any contingent commissions paid to OSC."  *Id.* at 19.  In light of Magistrate Judge Toliver's ruling granting Roberts's motion to compel answers to interrogatories related to the calculation of contingent commissions, as well as her decision ordering Defendants to designate a Rule 30(b)(6) deponent to replace Robertson, the court will deny Defendants' motion for partial summary judgment, as it is premised entirely on the purported inability of Robertson to quantify his damages.  Given Magistrate Judge Toliver's ruling, it would be unjust for the court to rule in Defendants' favor on the basis urged when Roberts was not

---

[7] Defendants are not moving for summary judgment on Roberts's claim for breach of contract regarding deductions from his Shellpoint commissions in the amount of $35,000 per month for a period of ten months.  *See* Defs.' Summ. J. Br. 18 (Doc. 75) ("Plaintiff's claim for breach of contract on shared expenses has numerous material fact issues in dispute, so it is not appropriate for summary judgment.").

provided adequate discovery from which he (or his experts) could quantify the amount of alleged contingent commissions owed him.

## 2. Waiver

Defendants seeks summary judgment on the affirmative defense of waiver. In support, they argue that the "undisputed evidence conclusively established [Roberts] waived his claim for contingent commissions." Defs.' Summ. J. Br. 20 (Doc. 75). Defendants argue and introduce evidence that during the approximately four years he was employed by them, Roberts never informed OSC that he expected to be paid on contingent commissions, accepted commission payments without being paid on contingent commissions, and despite making repeated objections about the amount of his commissions to Robertson and Dangoia, remained silent about his alleged right to be paid on contingent commissions. According to Defendants: "[Roberts's] silence and inaction regarding contingent commissions establishes waiver and summary judgment should issue." *Id.* at 22.

In opposition, Roberts contends that Defendants are not entitled to summary judgment on their affirmative defense of waiver based on the facts and circumstances in this case. Roberts concedes that he never informed OSC that he sought to be paid on contingent commission until after they terminated his employment in March 2015. He states in his Declaration and also stated at his deposition that Defendants did not routinely provide him with commission statements breaking out the source of his commissions, leaving him unsure on what he was and was not paid. Pl.'s Resp. App. 331, 350. Roberts also states in his Declaration that when he noticed a drop in his commission checks in the Fall of 2013, he discussed the problem with Robertson and others, and realized his commission was being calculated in accordance with the terms of the 2011 Commission Agreement as it related to the renewal rate. According to Roberts, at the time he was focused on that issue and

did not realize he was not being paid on the contingent commissions revenue. *Id.* at 331. He also states that in March 2014, when he was working with management to restructure the commission structure, his focus was on that task and, once again, he did not realize he had not been paid on the contingent commission revenue. *Id.* According to Roberts, it was not until after his termination in March 2015, that he began reviewing the commission statements he did have and the checks he had been paid and realized he had no been paid his contingent commission percentage. *Id.* At his deposition, Roberts stated: "I just assumed that I'm being paid on the revenue that is produced by the accounts I bring in that, unless any revenue is specifically excluded, contingent commission[s] are included in that commission." *Id.* at 383.

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.* "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). As explained by the Texas Supreme Court:

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right. Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, as in this case, the question becomes one of law.

*In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (quoting *Jernigan v. Langley*, 111 S.W.3d 153, 156-57 (Tex. 2003) (citations omitted)). Under Texas law, waiver is an affirmative

defense, and the party asserting waiver has the burden of proof. *Castle Hills Pharmacy, LLC v. Trial*, 2014 WL 3587382, at *5 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Defendants have failed to provide sufficient summary judgment evidence of Roberts's specific intention to waive his alleged contractual right to contingent commissions, and the court cannot imply intent from the surrounding facts and circumstances in this case. While the circumstances indicate possible inattention or perhaps lack of care on Roberts part, they do not imply that he intended to waive a right by not complaining until after Defendants terminated his employment. *See Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005) ("While waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right.").

Further, Defendants cite to no case holding that a party to a contract waived a right when he or she did not actually know facts pertinent to the breach. In *Tenneco*, the Texas Supreme Court found waiver established as a matter of law for a contractual provision prohibiting assignment of an ownership interest in a fractionation plant unless the assignee agreed to deliver 31,000 barrels of natural gas liquids per day to the plant. 925 S.W.2d at 642-43. The assignee never agreed to the delivery requirement and failed to meet the quota for three years. *Id.* The evidence showed that the plaintiffs actually knew that the assignor had transferred its ownership interest to the assignee, and the plaintiffs accepted the assignee's delivery of less than 31,000 barrels per day for three years. *Id.* at 643. There, actual knowledge was key to establishing waiver.

Here, Roberts has submitted evidence that Defendants did not routinely provide him with commission statements and that he had no actual knowledge until *after* his employment was terminated that the contingent commissions were not included in his earnings. He has also provided

evidence that during the periods he was negotiating with Defendants regarding the amount of his commission and advocating for changes in the compensation structure, he was not focused on the issue of whether contingent commissions were being paid. In his deposition, Roberts stated : "I just assumed that I'm being paid on the revenue that is produced by the accounts I bring in that, unless any revenue is specifically excluded, contingent commission[s] are included in that commission." Pl.'s Resp. App. 383. On this record, the court concludes that Roberts's lack of knowledge is sufficient to defeat Defendants' motion for summary judgment on their affirmative defense of waiver. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 542-43 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In that case, Garden Ridge claimed that from 2003 to 2009, Clear Lake charged it impermissible fees under a commercial real property lease. *Id.* at 532-34. Clear Lake raised several affirmative defenses, including waiver. *Id.* at 533. The court held that Garden Ridge's payments did not constitute waiver because Garden Ridge paid the management fee without knowing that the fee included charges not authorized by the lease, and the fee statements suggested the entire fee was proper. *Id.* at 543. The court also noted that "Clear Lake cites no case holding that a party to a contract waived a right when the plaintiff did not actually know facts pertinent to the breach." *Id.* at 542; *see also Enterprise–Laredo Assocs. v. Hachar's, Inc.*, 839 S.W.2d 822, 836 (Tex. App.-San Antonio 1992), writ denied, 843 S.W.2d 476 (Tex. 1993) (per curiam) (settlement agreement whereby parties agreed to "waive any other violations of the Lease" occurring before a particular date did not establish affirmative defense of waiver when the plaintiff "was not aware of the CAM overcharges at the time it signed the agreement"; thus, the plaintiff did not waive the right to sue for CAM overcharges).

As Roberts has provided summary judgment evidence raising a genuine dispute of material fact as to whether he had knowledge that his commissions did not include amounts from contingent commissions, Defendants' motion for summary judgment on the affirmative defense of waiver will be denied.[8]

### 3. Roberts's Promissory Estoppel and Quantum Meruit Claims

Defendants also move for summary judgment on Roberts's claims for promissory estoppel and quantum meruit. In his response brief, Roberts fails to address his promissory estoppel and quantum meruit claims against Defendants, much less respond to any of Defendants' arguments in support of their motion for summary judgment on these two claims. The court concludes that Roberts has abandoned or waived his promissory estoppel and quantum meruit claims against Defendants. As previously stated, when a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d at 588 n.1 (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d at 262(noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[]") (citation omitted). As Roberts failed to pursue his promissory estoppel and quantum meruit claims against Defendants, they are no longer before the court, and he has abandoned or waived them. Accordingly, the court will grant summary judgment

---

[8] In his motion for summary judgment, Roberts argues that he is entitled to summary judgment on Defendants' affirmative defense of waiver. In support, he states: "There is no evidence Roberts waived his entitlement to his commissions under the Commission Agreement." Pl.'s Summ. J. Br. 38 (Doc. 81). Based on the evidence considered by the court in denying Defendants' argument that Roberts waived his right to assert a breach of contract claim for the contingent commissions, the court similarly will deny Roberts's motion for summary judgment on this affirmative defense.

in Defendants' favor on Roberts's promissory estoppel and quantum meruit claims based on his abandonment or waiver of these claims.

### 4. Roberts's Request for Declaratory Relief

Defendants move for summary judgment on Roberts's request for declaratory relief. In support, Defendants argue that Roberts's request for declaratory judgment is duplicative and unnecessary because resolution of his breach of contract claim will necessarily resolve his request for declaratory judgment. In response, Roberts clarifies that his request for declaratory judgment is unrelated to his breach of contract claim. Instead, he seeks a declaration as to the rights and obligations of the parties with respect to certain entities in which Defendants asserted an ownership interest in their March 20, 2015 letter terminating his employment. *See* Pl.'s Summ. J. Resp. Br. 17-18 (Doc. 94). Given that Roberts is not seeking declaratory relief with respect to his breach of contract claim, the court will deny Defendants' motion for summary judgment as to this claim. In addition, Defendants' request for summary judgment on a claim for declaratory judgment is denied as premature.

### C. Defendants' Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71) and Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104)

On July 18, 2017, Magistrate Judge Toliver held a hearing on Roberts's motion to compel and granted the motion with respect to certain answers to interrogatories, reopened discovery, and ordered Defendants to designate a new Rule 30(b)(6) deponent in place of Robertson. Prior to this ruling, Defendants filed their Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71) and Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104). These motions are largely predicated on the argument that Roberts and,

in turn, his experts, are unable to calculate the amounts due him for contingent commissions, and that Roberts could have sought this information from the insurance carriers, rather than from Defendants. In light of the intervening ruling by Magistrate Judge Toliver, it appears to the court that these motions no longer "hold water." At a minimum, the court is unable to ascertain whether, and to what extent, Defendants' arguments in support of these motions, have been explicitly or implicitly rejected by Magistrate Judge based on her ruling. For these reasons, the court will deny without prejudice Defendants' Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71) and Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104).

### D. Plaintiff's Motion to Exclude Expert (Doc. 76)

Roberts moves the court to exclude the expert witness testimony of Philip L. Blais. He argues that the testimony should be excluded because: (1) Mr. Blais is not qualified to testify to the issues involved in this case; (2) Mr. Blais's opinions are not reliable; and (3) Mr. Blais's opinions are not relevant. Further, Roberts argues that Mr. Blais's opinions should be stricken for his failure to comply with Fed. R. Civ. P. 26a(2)(B).

The Federal Rules of Civil Procedure set forth the procedures litigants must follow in designating expert witnesses. Rule 26(a)(2)(B) provides in pertinent part:

> Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . . The report must contain:
>
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

In response to Roberts's motion, Defendants fail to provide any argument that they have complied with Rule 26(a)(2)(B)(iv), (v), and (vi). For this reason, the court will grant Plaintiff's Motion to Exclude Expert (Doc. 76).

Alternatively, the court concludes that Defendants have failed to meet their burden under Federal Rule of Evidence 702(a) of showing that Mr. Blais has the requisite knowledge, skill, experience, training and education to render a opinion requiring force-placed insurance knowledge and contingent commissions. Mr. Blais is offered to refute the testimony of Roberts's insurance experts. Mr. Blais did not provide his resume but instead provided a summary of his "experience and expertise." He asserts he is an expert in the insurance field specializing in "professional liability (which includes Directors and Officers Liability, Errors and Omissions coverage, Employment Practices liability, Crime Insurance, Fiduciary Liability, Cyber Liability and Kidnap and Ransom Liability), aviation and financial institution coverages." The court agrees with Roberts that Mr. Blais's experience and expertise do not reflect "any knowledge in force-placed insurance coverage, expense allocation or contingent commissions. His opinions do not reflect any knowledge in these areas, only conclusory statements." Pl.'s Mot. to Exclude ¶ 12. Moreover, in light of this deficiency, Defendants have not established that Mr. Blais's testimony will be relevant and reliable, or how it

will "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). For these reasons, the court will grant Plaintiff's Motion to Exclude Expert.

## IV.  Conclusion

For the reasons herein stated, the court **grants in part** and **denies in part** Plaintiff's Motion for Partial Summary Judgment (Doc. 80). Specifically, the court **grants** the motion with respect to Defendants' counterclaims of fraud by nondisclosure, misappropriation of trade secrets, and breach of the confidentiality agreement, and **dismisses with prejudice** these counterclaims; and **grants** the motion with respect to Defendants' affirmative defenses of offset, failure to mitigate, accord and satisfaction, novation, estoppel, duress, and ratification, and **dismisses with prejudice** these affirmative defenses. The court **denie**s Plaintiff's Motion for Partial Summary Judgment in all other respects.

Further, the court **grants in part** and **denies in part** Defendants' Motion for Partial Summary Judgment (Doc. 74). Specifically, the court **grants** the motion with respect to Roberts's claims for promissory estoppel and quantum meruit, and **dismisses with prejudice** these claims. The court **denie**s Defendants' Motion for Partial Summary Judgment in all other respects.

Further, the court **denies without prejudice** Defendants' Motion to Exclude the Testimony and Report of J. Daniel Caskey, Mark A. Gannaway, and Janice Williams (Doc. 71); **denies without prejudice** Defendants' Motion to Strike Plaintiff's Untimely Expert Declarations (Doc. 104); **grants** Plaintiff's Motion to Exclude Expert (Doc. 76); and **overrules as moot** all remaining evidentiary objections made by either party upon which the court has not already ruled in this decision, as it has not had need to consider any of this evidence in reaching its decision.

The claims and counterclaims remaining for trial are: Roberts's claim for breach of contract with respect to the payment of contingent commissions and the deductions from his Shellpoint commissions in the amount of $35,000 per month for ten months; Roberts's request for declaratory relief; Defendants' counterclaim for breach of fiduciary duty; and Defendants' affirmative defenses of mistake, unclean hands, and waiver. The court will reset the trial of this case and pretrial deadlines by separate order. **In light of this opinion and the necessarily fact-intensive nature of the waiver defense, the court directs the parties to inform it in writing by March 30, 2018, whether this action is suitable for mediation before a mediator or a magistrate judge.**

It is so **ordered** this **23rd day** of **March, 2018.**

Sam A. Lindsay
United States District Judge